IN RE APPLICATION OF HARTMAN.
CARL HARTMAN, JR., ET AL., APPELLEES, V. GLENWOOD TELEPHONE MEMBERSHIP CORPORATION, A NEBRASKA CORPORATION, APPELLANT.
249 N. W. 2d 468

Filed January 12, 1977. No. 40753.

William G. Cambridge, for appellant.

Robert E. Vogler, for appellees.

Heard before SPENCER, BOSLAUGH, NEWTON, and BRODKEY, JJ., and BURKE, District Judge.

BRODKEY, J.

This is an appeal from an order of the Public Service Commission granting an application filed by appellees under sections 75-612 to 75-615, R. R. S. 1943, to obtain telephone service in an exchange service area adjacent to the area in which they now reside. Appellant telephone company, which operates in the territory in which the applicants-appellees reside, protested the application, and now appeals to this court. We affirm.

Carl and Phyllis Hartman, appellees herein, applied to the Public Service Commission on June 25, 1975, to obtain the telephone service furnished by the Guide Rock exchange of the Lincoln Telephone and Telegraph Company (LT&T), which is the exchange service area adjacent to the territory in which the Hartmans reside, which is in the Blue Hill exchange of the Glenwood Telephone Membership Corporation (Glenwood). Glenwood filed a nonconsent and protest to the application. A hearing was had before the Commission on September 30, 1975, and on December 11, 1975, the Commission granted the application on condition that the Hartmans pay Glenwood $173.73 as its loss of investment. On De-

cember 22, 1975, Glenwood moved for rehearing, and on March 1, 1976, the Commission denied the motion. Glenwood now appeals to this court.

The facts adduced at the hearing on September 30, 1975, are as follows. In January 1975, approximately 5 months before filing their application with the Commission, the Hartmans moved from one farm located in the Guide Rock exchange of LT&T, to another farm 4/10 of a mile west. The new residence is located in the Blue Hill exchange of the Glenwood service area, and all calls to Guide Rock from that residence would be long distance calls. The Hartmans object to paying long distance rates for calls to Guide Rock, and therefore have maintained an LT&T phone at the old residence, which they continue to lease. The Hartmans have not obtained, and do not intend to obtain, service from Glenwood in their new residence.

Mr. Hartman, a farmer, does his livestock and grain trading in Guide Rock, and conducts other business there. The parents of both Mr. and Mrs. Hartman live in Guide Rock, as does Mr. Hartman's brother. The Hartmans attend church in Guide Rock, and Mrs. Hartman belongs to the Eastern Star of Guide Rock. Activities in these organizations require that telephone calls be made to persons in Guide Rock. They have no close relatives and few friends in the Glenwood service area and the only real contact they have with Blue Hill is that their dentist is located there. The Hartmans live 15 miles from Blue Hill and 10 miles from Guide Rock and are located in the Guide Rock fire district.

The Hartmans now make calls to Guide Rock from their old residence, although this is obviously an inconvenience. They testified that they would not keep the LT&T phone in the old residence if their application is granted. If the application is not granted, they would still not use Glenwood service. Their sole objection to Glenwood service is the fact that long distance rates

would be charged when they make calls to Guide Rock. The Hartmans are willing to pay Glenwood for its loss of investment if their application is granted. LT&T has indicated by letter received by the Commission July 7, 1975, that it is willing to provide service to the Hartmans if their application is granted, and that no construction charges will be involved.

The statutes involved in this appeal, and under which the application was filed, were enacted in 1969 as L.B. 906. The reason for the enactment of the statute was made clear by Senator Rick Budd, Chairman of the Committee on Public Works, in the statement of intent for L.B. 906, where he states: "Under the present law, a telephone user is not able to petition the State Railway Commission for telephone service of another exchange or for service of any exchange if he is not within any telephone company's territory. The Nebraska Supreme Court has held that petitions of this kind under the present exchange territorial law may be made by telephone companies only. The telephone user, therefore, cannot have a 'day in court' and cannot have regulatory relief no matter what the merits of his situation will be. LB 906 will permit all telephone users, whether individuals, partnerships, corporations, or others, and whether they use residence service or business service to petition the Commission for a change of telephone service and to have hearings on their cases. * * * LB 906 * * * permits adjustments in the boundaries of established exchange territories where conditions warrant." L.B. 906 now appears in our statutes as sections 75-612 to 75-615, R. R. S. 1943. Section 75-612 provides that an individual or company may file an application with the Commission to obtain the telephone service furnished in the exchange service area adjacent to the territory in which the applicant resides or operates. Section 75-613 provides as follows: "Upon the completion of the hearing on such an application, if a hearing is required, the State Railway Commission

may grant the application, in whole or in part, if the evidence establishes all of the following: (1) That such applicant or applicants are not receiving, and will not within a reasonable time receive, reasonably adequate exchange telephone service from the company furnishing such service in the exchange service area in which the applicant or applicants reside or operate; (2) The revision of the exchange service area or areas required to grant the application will not create a duplication of facilities, is economically sound and will not impair the capability of the telephone company or companies affected to serve the remaining subscribers in any affected exchanges; (3) The community of interest in the general territory is such that the public offering of each telephone company in its own exchange service area involved should include all the territory in its service area as revised by the commission's order; and (4) The applicant or applicants are willing and will be required to pay such construction and other costs and rates as are fair and equitable and will reimburse the affected company for any necessary loss of investment in existing property as determined by the State Railway Commission." In its order entered on December 11, 1975, the Public Service Commission found that the application should be granted because the evidence established that the appellees met the requirements of, and qualified under, each of the four subparagraphs of section 75-613.

Appellant's principal assignments of error, which it claims require a reversal of the order of the Commission and the vacation and setting aside thereof, are that the Commission erred (1) in finding that the revision of the exchange service areas would not create a duplication of facilities; (2) that the granting of the application was economically sound; and (3) that Glenwood's loss of investment as a result of the application being granted was only $173.73. Appellant also claims that the Commission erred in failing to make and file

its decision upon the application within 30 days of the hearing thereon, and in failing to make and file its decision on appellant's motion for rehearing within 30 days after the completion of the hearing upon said motion.

The testimony of appellant's witnesses may be summarized as follows. Clive O. Pulver, general manager of Glenwood, testified that Glenwood has 2,204 subscribers in 8 exchanges. It has 2.4 subscribers per mile of line, as compared to LT&T's 30 to 40 subscribers per mile of line. Subscribers in the Blue Hill exchange must, when calling Guide Rock, pay a long distance rate of 25 cents per minute during the day, and 16 cents per minute in the evening. The charge for 3 minutes is 51 cents during the day and 33 cents in the evening. The regular monthly charge for Glenwood service is $4.75. Pulver stated that Glenwood service is good and that it has had no complaints with its service.

Glenwood contends that there would be a duplication of service if the Hartmans' application is granted. Glenwood already has a "drop wire" extending from its main line to the Hartman residence, as the Hartmans' predecessor had Glenwood telephone service. If the application is granted, Glenwood would have to remove this drop wire, which is 2/10 of a mile long, and LT&T would have to extend its line 4/10 of a mile west from the old Hartman residence. Pulver stated that if Glenwood loses the Hartmans, its facilities serving the Hartman residence are rendered useless from the Hartman residence all the way back to its central office at Blue Hill. The party line serving the area would, of course, remain, but Glenwood would have four, rather than five, subscribers on that line, and therefore have equipment not being used to its full capacity.

Pulver testified that granting the application would impair the capability of Glenwood to serve its remaining subscribers because more people would want to be

released. He testified that the cost for LT&T to extend its line 4/10 of a mile was not economically sound, and speculated that LT&T might have to build additional facilities in the future if additional subscribers in the Glenwood area were allowed to transfer to the LT&T service area. This, stated Pulver, would be a duplication of services since Glenwood already has facilities to serve the subscribers in its area.

The accountant for Glenwood, also named Hartman, testified as to what Glenwood's loss of investment would be if the application were granted. In one calculation, he computed the loss as $531.57. He arrived at this figure by taking the total value of the Glenwood plant in service, less depreciation, and dividing that value by the total number of Glenwood subscribers.

He also made a second alternative calculation in which he computed the investment cost of poles and wire on each of the five sections of line that lead from Blue Hill to the Hartman residence. He divided that investment cost for each section by the number of subscribers that section serves, arriving at a cost per subscriber in each of the five sections. He added these together, arriving at $812.61. To that figure he added connection costs, central office equipment costs per subscriber, and the cost of removing the drop line extending from the main line to the Hartman residence. He then subtracted depreciation and salvage estimates on the equipment to be removed. The accountant arrived at a figure of $758.64 as representing Glenwood's investment loss, should the application be granted. The accountant acknowledged that his first calculation was an average, and did not show actual investment cost for any given customer. The second calculation was based on figures reflecting the current cost of the components involved at today's market prices.

Finally, the president of Glenwood, Douglas Zuellner, testified that if this application were granted, possibly 20 to 30 other Glenwood subscribers would desire to be

released. He noted that under Glenwood's mortgage to the United States government, it should seek to retain all the subscribers in its area. Glenwood has grown over its 17-year history, and the company has more subscribers today than when it was formed, although its growth has not been spectacular. Zuellner thought that the loss of the Hartmans would impair the capability of his company. Zuellner acknowledged on cross-examination that no other persons in the Glenwood area have yet actually applied for release, and also that he is not presently receiving any revenue from the Hartmans' station.

There would seem to be no serious question that the Commission was correct in finding that the Hartmans were not receiving reasonably adequate exchange service. The evidence is overwhelming that their "community of interest" was in Guide Rock; and most of their relatives, friends, and business contacts were there, notwithstanding the evidence adduced by appellant that the Hartmans also had connections in other neighboring localities, for which calls they would, of necessity, have to pay toll charges. The evidence also reveals that although the monthly service charge for Glenwood was somewhat less than the local service charge out of the Guide Rock exchange, nevertheless, Glenwood was unable to provide private line service to the Hartmans, and their charges were computed on the basis of multiple party use.

Glenwood next contends that granting the application in question would result in the duplication of facilities since it is now capable of serving the Hartman residence. It argues that even if the drop line to the Hartman residence is removed there is a duplication of facilities because the party line serving the area in which the Hartmans reside will not be used to full capacity, and therefore Glenwood will have idle facilities extending clear back to a central office in Blue Hill. Glenwood contends that such duplication of facilities is

not economically sound; and also contends that its loss of investment if the application is granted is more than $173.73 because its actual loss of investment should be calculated by determining the Hartmans' proportionate share of investment costs from their residence back to Blue Hill.

It would appear that the Commission's calculation as to investment loss was clearly reasonable. By the testimony of Glenwood's accountant, there are five sections of wire leading to the Hartman residence from Blue Hill. The Hartman residence is on the last section. The investment cost per subscriber on that section is $140.38. Connection costs for that section are $28.01. The Commission added together those costs, and subtracted depreciation at a rate (34%) in accordance with Glenwood's computation of depreciation. The Commission then added on $120, which is the cost of removing the drop line to the Hartman residence, but subtracted $57.41, the estimated salvage value of the equipment to be removed. The final figure the Commission arrived at was $173.73. This figure would be representative of Glenwood's actual investment cost for service at the Hartman residence.

Under Glenwood's theory, the Hartmans would have to pay investment costs for sections other than the one that serves the Hartmans, even though those sections remain fully intact and in use. Glenwood errs in its contention the Commission concluded that the only loss of investment would be the cost of the drop wire to the Hartman residence. The Commission included in its computation the cost of the drop wire as well as the Hartmans' pro rata share of the investment costs for the section of wire serving their residence.

We now consider Glenwood's contention that granting the application will result in a duplication of facilities. It is clear that there would be a duplication of facilities in the sense that Glenwood is able to serve a residence which LT&T will serve if the application is

granted. On the other hand, the Hartmans do not presently, and do not intend in the future, to receive Glenwood service. There is no actual duplication of facilities once the drop wire to the Hartman residence, now useless, is removed. Under Glenwood's theory, any time a telephone company has facilities to serve a resident in its area, that resident's application for other service under section 75-613, R. R. S. 1943, must be denied because granting the application would result in a duplication of facilities. Glenwood's interpretation of section 75-613 would permit granting an application only if the telephone company serving the applicant's territory did not have any facilities capable of serving that particular applicant. Such an interpretation would severely limit the applicability of section 75-613, and would give rise to difficult questions in future cases as to whether the telephone company serving the area of an applicant has facilities capable of serving that applicant when its wires run near, but not directly to, the applicant's residence.

Glenwood contends that the language of Radio-Fone, Inc. v. A. T. S. Mobile Telphone, Inc., 187 Neb. 637, 193 N. W. 2d 442 (1972), in reference to duplication of facilities should be applied in this case. This seems inappropriate since that case did not involve section 75-613, R. R. S. 1943, but rather involved an application of a telephone company to operate in a territory already occupied by another company. In Schoen v. American Communication Co., Inc., 189 Neb. 78, 199 N. W. 2d 716 (1972), this court stated that section 75-613 introduces a new concept, and that the phrases in that section acquire a new meaning limited to the context of the section. Radio-Fone involved section 75-604, R. R. S. 1943, not section 75-613, R. R. S. 1943, and therefore is not authority for the case at hand.

As stated, sections 75-612 and 75-613, R. R. S. 1943, were enacted in 1969, and have been interpreted by this court only one time since then, in the case of Schoen v.

American Communication Co., Inc., *supra,* a case strikingly similar factually to the present case. In Schoen, an individual residing in the Reynolds exchange of American Communication Company, Inc. (American), applied for telephone service from the Fairbury exchange of LT&T. To serve the applicant, LT&T had to extend its lines 1½ miles from its nearest subscriber in the Fairbury exchange. This extension would have been to a point only 2 miles from the base rate area of American. The applicant had refused American service since he moved to his home in 1957. The applicant's sole complaint was that he would have to pay long distance rates on calls from the American service area to Fairbury. The applicant's business acquaintances, children's schools, family friends, and church were located in Fairbury, and he had no community of interests in the Reynolds service area other than the fact that his farm was located there. The commission granted the application. This court upheld the Commission, stating: "It is possible to construe the statute of 1969 to provide a new remedy but otherwise to maintain the status quo. We think the statute introduces a new concept. An applicant may prevail without proving inadequacy of service or unfairness of rates in the tradition of public utility law. The concept that such relief furthers the public interest is new but not startling. See Trebing, op. cit. at 302 and 310. Such phrases as 'reasonably adequate service,' 'duplication of facilities,' 'public interest,' and 'community of interest in the general territory' acquire a new meaning limited to the context of §§ 75-613 and 75-614, R. R. S. 1943. Definition must evolve, case by case.

"The small independent companies worry that affirmance here will signal a trend toward erosion of their service areas. *The argument is wide of the mark.* We decline to conjecture future legislation on action of the commission as well as the impact of the technological revolution in communications." (Emphasis sup-

plied.) The Schoen case, itself, does not define the phrases it referred to in section 75-613, R. R. S. 1943, and does not explain how those phrases were applied in the case. It is clear, however, that those phrases acquire a new meaning limited to the context of section 75-613, and therefore prior cases construing different statutory provisions which use similar phrases are not dispositive in a section 75-613 case.

Under Schoen, the order of the Commission in the case at hand should be affirmed. In Schoen, as here, the applicant had a community of interests in a town outside his telephone service area, and had never received the service of the telephone company in the territory in which he resided. In Schoen, LT&T had to extend its lines 1½ miles to the applicant's residence, while here LT&T had to extend its line only 4/10 of a mile. In Schoen, as here, the sole objection of the applicant to service from the company serving his area was long distance rates to the town where he had a community of interests.

It appears that the real concern of Glenwood in this case is that it may have a "floodgate" effect of encouraging other residents in its area to apply for service from adjacent areas. The same concern was raised in Schoen, but dismissed by the court as "wide of the mark." Although Glenwood's concern is not frivolous, it appears to be largely speculative. In this case the appellees had always received LT&T service until they moved just 4/10 of a mile west from their old residence. They have refused service from Glenwood, and do not intend to obtain it even if their application is denied. They maintain an LT&T phone in their old residence despite the inconvenience. Their community of interests is clearly in Guide Rock, and they have little connection with Blue Hill or residents of the Glenwood service area.

The telephone company in Schoen also argued that granting the application would result in numerous sub-

sequent applications, yet we note that the present case is only the second one involving section 75-613, R. R. S. 1943, to reach this court. It does not appear that the Schoen case created an incentive for widespread granting of applications.

Glenwood also argues that the order of the Commission in this case is void because the Commission failed to file its decision within 30 days after the hearing. Section 75-128, R. S. Supp., 1976, provides that except for good cause shown, "a decision of the commission shall be made and filed within thirty days after completion of the hearing or after submission of affidavits in nonhearing proceedings."

The court has not heretofore decided as to the effect of a failure of the Commission to file its decision within 30 days of the hearing. In Ready Mix, Inc. v. Nebraska Railroads, 181 Neb. 697, 150 N. W. 2d 275 (1967), this court, in describing the statutory scheme, stated: "On any matter heard by an examiner a decision *should* be filed within 30 days after oral argument to the commission." (Emphasis supplied.) That case involved the question of whether oral argument in regard to challenges of commodity rates for intrastate transportation of cement set by the Commission was required, or whether written argument was sufficient. While the facts of the case are unclear, it appears that a final order of the Commission in that case was entered more than 30 days after an evidentiary hearing before an examiner. See 181 Neb. at 702.

In 1 Am. Jur. 2d, Administrative Law, § 46, p. 847, it is stated: "A common problem of statutory construction is the determination whether a provision is mandatory or merely directory, permissive or discretionary. * * * Generally speaking, those provisions which do not relate to the essence of the thing to be done and as to which compliance is a matter of convenience rather than substance are directory, while the provisions which relate to the essence of the thing to be done,

that is, to matters of substance, are mandatory. * * *
While the word 'shall' may render a particular pro-
vision mandatory in character, when the spirit and pur-
pose of the legislation require that the word 'shall' be
construed as permissive rather than mandatory, such
will be done. * * * Provisions governing the time for
doing an act, or directing the doing of certain things
within certain times without any negative words re-
straining the doing thereof afterward, are deemed to
be directory." To the same effect see, State ex rel.
Kobes v. Grimm, 115 Neb. 230, 212 N. W. 437 (1927);
Barkley v. Pool, 102 Neb. 799, 805, 169 N. W. 730 (1918).
We also point out that the purpose of section 75-128,
R. S. Supp., 1976, is to insure that "all matters pre-
sented to the commission be heard and determined
without delay." The delay in this case did not harm
Glenwood; but if anyone was prejudiced it was the
Hartmans.

It should also be noted that the motion for rehearing
was filed on December 22, 1975, and the order over-
ruling the motion for rehearing was not filed until
March 1, 1976. Section 75-137, R. R. S. 1943, provides
that "when the commission fails to enter an order rul-
ing on a motion for rehearing within thirty days after
such motion is filed, the appeal to the Supreme Court
may be perfected by filing a notice of appeal before
the commission enters an order ruling on the motion
for rehearing, and the review by the Supreme Court
shall be the same as if the commission had overruled
the motion for rehearing."

Apparently, Glenwood was not particularly concerned
that the Commission exceeded 30 days in ruling on its
motion for rehearing, and did not seem to view the de-
lay as prejudicial, for it made no attempt to appeal
sooner as it might have done under section 75-137, R.
R. S. 1943. We conclude that this assignment of error
is without merit.

The standard of review in appeals from the Public

Service Commission is well established. The order of the Commission will be affirmed if the Commission acted within the scope of its authority and if its order is reasonable and not arbitrary. Nebraska Railroads of Omaha v. Nebco, Inc., 194 Neb. 322, 231 N. W. 2d 505 (1975); Dahlsten v. Harris, 191 Neb. 714, 217 N. W. 2d 813 (1974); Ruan Transport Corp. v. Herman Bros, Inc., 192 Neb. 343, 220 N. W. 2d 245 (1974); Radio-Fone, Inc. v. A. T. S. Mobile Telephone, Inc., *supra*. If there is evidence to sustain the findings of the Commission, this court cannot intervene. Ace Gas, Inc. v. Peake, Inc., 184 Neb. 448, 168 N. W. 2d 373 (1969).

We conclude that the Commission acted within the scope of its authority and that under the facts of this case, as disclosed by the record, its order was reasonable and not arbitrary. There is evidence in the record to sustain the findings of the Commission; and, therefore, under the foregoing rules, the order of the Public Service Commission must be affirmed.

AFFIRMED.