IN RE APPLICATION OF FRANKLIN D. REIS ET AL., FOR AUTHORITY TO RECEIVE TELEPHONE SERVICE FROM THE HASTINGS OR JUNIATA EXCHANGE OF THE LINCOLN TELEPHONE AND TELEGRAPH COMPANY.
FRANKLIN D. REIS ET AL., APPELLEES, v. THE GLENWOOD TELEPHONE MEMBERSHIP CORPORATION, A NEBRASKA CORPORATION, APPELLANT.

274 N. W. 2d 539

Filed January 24, 1979. No. 41775.

William G. Cambridge, for appellant.

Conway and Connolly, for appellees.

Heard before SPENCER, C. J., PRO TEM., BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ., and KUNS, Retired District Judge.

CLINTON, J.

This appeal arises from an application by three rural subscribers of The Glenwood Telephone Membership Corporation, Franklin and Ruby Reis, David and Susan Fredricks, and Ryal and Virginia Reis, under the provisions of sections 75-612 through 75-615, R. R. S. 1943, to obtain telephone service from either the Hastings or Juniata exchange of the Lincoln Telephone and Telegraph Company and to have applicants' part of the service territory of Glenwood added to the service territory of LT&T. Glenwood protested the change and the application; and the commission, after notice to interested parties including LT&T, held a hearing as required by section 75-612, R. R. S. 1943. After the hearing the commission made findings and granted the application.

Glenwood then appealed to this court. We remand for further proceedings.

Section 75-613, R. R. S. 1943, provides that the commission may grant such an application "if the evidence establishes all of the following:

"(1) That such applicant or applicants are not receiving, and will not within a reasonable time receive, reasonably adequate exchange telephone service from the company furnishing such service in the exchange service area in which the applicant or applicants reside or operate;

"(2) The revision of the exchange service area or areas required to grant the application will not create a duplication of facilities, is economically sound and will not impair the capability of the telephone company or companies affected to serve the remaining subscribers in any affected exchanges;

"(3) The community of interest in the general territory is such that the public offering of each telephone company in its own exchange service area involved should include all the territory in its service area as revised by the commission's order; and

"(4) The applicant or applicants are willing and will be required to pay such construction and other costs and rates as are fair and equitable and will reimburse the affected company for any necessary loss of investment in existing property as determined by the Public Service Commission."

Among the findings of the commission are the following: "From a purely physical standpoint, the service of the Roseland exchange of the Glenwood Telephone Membership Corporation is unquestionably adequate. However, from the Applicants' standpoint, Roseland exchange service is inadequate since their community of interest is Hastings.

"The evidence establishes that the applicants are the only subscribers of Glenwood served by their telephone line in the immediate area. With the granting of this application, this line would no longer

be needed to serve other subscribers and no duplication of facilities would result. In view of the testimony that the applicants will compensate Glenwood for its loss of investment, we conclude that the revision of exchange service areas is economically sound and will not impair the capability of the telephone companies involved to serve the subscribers in their respective exchanges.

"The applicants' close ties with the town of Hastings and persons residing in the Hastings exchange of the Lincoln Telephone and Telegraph Company convince us that the community of interest in the general territory is such that the public offering of each telephone company in its own exchange service area involved will (sic) include all the territory in its service area as revised by this order. See, Schoen v. American Communication Co., Inc., 189 Neb. 78 (1972).

"The evidence establishes that the investment in the line serving the applicants is $2,980.67. The line is in new condition and therefore no depreciation will be deducted from the investment. Neither will any cost of removal be added, since the line will not be physically removed." The commission made an order accordingly.

The protestant Glenwood, on this appeal, asserts that the findings, insofar as they pertain to conditions (1) through (4) of section 75-613, R. R. S. 1943, are not supported by substantial evidence. It also contends that the commission failed to properly define and apply the various phrases of section 75-613, R. R. S. 1943, the precise meanings of which are not immediately evident from the words of subdivisions (1) through (4) of the statute, and that accordingly the order of the commission is arbitrary and unreasonable.

Sections 75-612 through 75-615, R. R. S. 1943, were first enacted in 1969 and this court has had occasion to consider these statutes only twice. Schoen v.

American Communication Co., Inc., 189 Neb. 78, 199 N. W. 2d 716; Hartman v. Glenwood Telephone Membership Corp., 197 Neb. 359, 249 N. W. 2d 468. In Schoen we said: "We think the statute introduces a new concept. An applicant may prevail without proving inadequacy of service or unfairness of rates in the tradition of public utility law. The concept that such relief furthers the public interest is new but not startling. . . . Such phrases as 'reasonably adequate service,' 'duplication of facilities,' 'public interest,' and 'community of interest in the general territory' acquire a new meaning limited to the context of §§ 75-613 and 75-614, R. R. S. 1943. Definition must evolve, case by case.

"The small independent companies worry that affirmance here will signal a trend toward erosion of their service areas. The argument is wide of the mark. We decline to conjecture future legislation or action of the commission as well as the impact of the technological revolution in communications."

In Schoen, the facts were that the applicant had never received service from American Communication Co., Inc., in whose service area the applicant resided. He desired to be served by LT&T. LT&T already had toll lines running past Schoen's rural residence. In order to service Schoen, all that would be required was the placing of circuitry on the existing poles from LT&T's nearest customer to Schoen's residence, a distance of 1 1/2 miles. Schoen's principal interest was in being able to call Fairbury, Nebraska, without paying toll charges. American's toll charges were not unreasonable. In the words of the court: "Indeed he admitted the reasonableness of the rate. From his viewpoint and to him alone the charge would be exorbitant." American's evidence was that the loss of one potential station (customer) would not affect the company adversely. The opinion made no mention of whether American suffered any investment loss nor did it

recite what the applicant would be required to pay for new construction.

In Hartman, the applicant resided in the Glenwood service area, having recently moved there from another farm where he was served by LT&T. The applicant was not a subscriber to Glenwood service at the new farm and did not intend to be served by Glenwood. However, a Glenwood line and drop were adjacent to the new residence and available to the applicant. This line had served the applicant's predecessor, who had been a Glenwood customer. In Hartman, the evidence indicated that Glenwood's loss of investment was $173.73. Glenwood was required to remove 2/10 of a mile of line and LT&T to extend its line 4/10 of a mile to serve Hartman. The cost of such extension is not mentioned in the opinion. Hartman desired LT&T service so that he could call Guide Rock, Nebraska, without paying toll charges. Applicant still maintained his former farm residence, and he used the LT&T phone there to make calls to Guide Rock. The applicant intended to drop that service if the application was granted.

On appeal by Glenwood, we affirmed the commission's determination that the applicant's "community of interest" was in Guide Rock and hence Hartman's service was not reasonably adequate. Glenwood's objection to the application in Hartman was based upon the claim that there were perhaps 20 to 30 other customers in a similar situation who would want to be released if the Hartman application was granted. The commission and this court gave no weight to that contention. On the facts recited, we also held that no duplication of service resulted.

The effect of our opinion in Schoen seems simply to be that we would define the terms of section 75-613, R. R. S. 1943, as we were confronted with the necessity of doing so and on a case-by-case basis;

that, under the facts of that case, no definition was necessary; that we would wait to see what the commission does in future cases and what the Legislature might do by way of making changes in the law; and we would not anticipate technological developments which might have a bearing in determining adequacy of service and economic soundness. Hartman seems to add that the removal of the lines of one company and replacing them with the lines of another does not result in duplication of facilities and that the concepts of inadequate service and community of interests are related considerations.

We now turn to an examination of the evidence in the case before us. The evidence here shows Glenwood has approximately 2,200 customers served by several different exchanges, including the Roseland exchange which serves the applicants. At present, Glenwood's service to the applicants is by buried underground cable and each applicant has a one-party line. Glenwood's basic rate for such service is $7.50 per month. An extension phone costs $1 per month. Franklin Reis and David Fredricks subscribe to what is described as optional calling service for which a $4 per month charge is made. This service permits the customer to make 60 minutes per month of toll calls, within a radius of 25 miles, without any additional charge during all the hours of the day except 8 a.m. to 12 noon, Monday through Friday.

LT&T cannot presently provide the applicants with one-party service. The service to be furnished would be multiparty, or four to eight customers per line. LT&T's service would permit the applicants to call Hastings, Nebraska, toll free. LT&T's basic charges for multiparty service are $7.95 per month plus tax. An extension phone costs an additional $1.25.

The complaints of Franklin Reis and David Fredricks concerning Glenwood's service are the

following: They make most of their calls to Hastings, Nebraska, and to do so must pay toll charges.

The evidence indicates that the telephone bill of Franklin Reis, including the basic charges, optional calling, and the excess of toll charges is presently about $18 to $20 per month. Mrs. Franklin Reis has an additional complaint. She is a freelance court reporter. Some of her customers have been unable to call her after Glenwood's recent change to one-party service because the Reis telephone number has been changed, and the taped response which a caller hears when calling the old number is that it is no longer in service. The caller is then asked to consult the directory or ask the operator for assistance. Because of the fact that the Franklin Reises have an Ayr, Nebraska, mailing address, but are connected to the Roseland exchange, customers cannot find the Reis number in the Ayr portion of the directory. Witnesses for LT&T and Glenwood testified that LT&T furnishes the directory service for Glenwood, based upon an alphabetical listing of customers furnished by Glenwood to LT&T. Difficulties such as that described by Mrs. Reis should not occur if the caller asked the operator for assistance rather than merely consulting the directory.

Ryal Reis does not reside at the location where his affected telephone is located. His Glenwood telephone is located on a pole in the feed yard. His number is unlisted and he uses the telephone only to make emergency calls, perhaps three or four times a month. The Ryal Reis feed yard is located between the Franklin Reis' and the David Fredricks' residences. If Glenwood were to continue to serve Ryal Reis, then Glenwood's underground line would remain in place and in use except for about 1/4 of a mile from the Ryal Reis feed yard to the Franklin Reis residence.

An inference can be drawn from the evidence that five other subscribers of Glenwood could reason-

ably make the same claims of community of interest as are made by Franklin Reis and David Fredricks and could be as readily served by LT&T as can the applicants.

The evidence on the issue of the economic soundness of the revision shows the following. The grant of the application in this case would make about 1 1/4 miles of Glenwood's underground cable useless in that only some small attachments could be salvaged and their value would be negligible. The commission found that the applicants, as a condition of being granted service, would be required to reimburse Glenwood for the previously mentioned investment loss of $2,980.67. In order to serve the applicants, LT&T would build either 1 1/2 or 1 3/4 miles of line, depending upon whether the applicants were to be served by the Hastings exchange or the Juniata exchange, an undetermined matter. The evidence does not disclose what the construction of the new line and installation of the phone service would cost; however, it does indicate that underground cable costs about $600 per mile in place. Other items of cost are not shown. Normally, LT&T extends their line for 1/2 mile without charge and the customer pays for the remainder. In addition, the customer is required to sign a maintenance contract to pay for some of the maintenance of the new line for a term of years. These charges are not shown by the evidence. The applicants testified that they are willing to reimburse Glenwood for the loss of investment as determined by the commission and agree to pay such construction and other charges as LT&T may impose for new construction to serve them.

All of Glenwood's assets are mortgaged to the United States in the principal amount of $3,754,553. Of that amount, $2,673,000 represents a recent addition to indebtedness for the purpose of making improvements, including the buried cable and the one-party service to the applicants and other customers.

These improvements are still in the process of being made. The interest on the loan is 2 percent. The Nebraska Public Service Commission authorized the borrowing and approved appropriate rates based upon a projected gross annual revenue of $416,208, projected assumed expenses, including debt service of $410,618, and a projected net income of $5,590 when the improvements are completed. These projections were founded upon an estimate of 2,455 subscribers. As noted, Glenwood had only 2,200 subscribers at the time of hearing. Until the projected number of customers is reached, there is a projected deficit of about $43,000 annually. Although the above figures are projections, there is no contradicting evidence. Glenwood's investment per customer, including central plant, is $1,649.

With the foregoing background, we turn to a consideration of the assignments of error made by Glenwood, treating them in relation to conditions (1) through (4) of section 75-613, R. R. S. 1943.

In both Schoen and Hartman, the applicants' need for local rather than toll service to a particular community was treated as satisfying the requirement of lack of reasonably adequate exchange service and the territorial community of interest requirements of the statute. The evidence in this case supports similar conclusions insofar as Franklin Reis and David Fredricks are concerned. The evidence here, however, clearly does not support the same finding as far as Ryal Reis is concerned. It is perfectly clear that he joined in the applications merely to accommodate the other applicants and to eliminate the problems of duplication of facilities which would exist if Glenwood were to continue to serve him while the other applicants were served by LT&T. In that situation there would have been a duplication of facilities within the meaning of the statute. We hold that the commission may include in the service territory change an applicant

whose service is reasonably adequate when inclusion is necessary to avoid a duplication of facilities.

In this case, Mrs. Franklin Reis has the additional complaint which we have earlier described concerning inadequate directory service. What consideration, if any, the commission gave to this item we have no way of knowing, for no specific finding with reference thereto has been made. It appears clearly from the evidence, however, that this was a defect which could be easily cured by an addition to the taped response which would tell the caller that if, in consulting the directory, the party being called cannot be found, then operator assistance should be requested. As noted, LT&T was furnished by Glenwood with an alphabetical list of customers which would enable the operator to find the number irrespective of differences in the mailing address and the name of the exchange. We hold that such an easily correctible defect in service is not alone sufficient to support a finding of no "reasonably adequate" service within the meaning of section 75-613 (1), R. R. S. 1943.

The findings of the commission in connection with certain terms of the second condition, namely, economic soundness and impairment of the capability of the telephone company affected to serve the remaining subscribers, require discussion. We refrained in the two previous cases from attempting any definition of these terms for the reason that the facts in those cases did not require or really permit a considered definition. Economic impact in each case was negligible. No customer who was being served was being lost by the protestant company. No substantial capital outlays were involved. It was not there possible to draw any conclusion that ability to service debt would be impaired, nor that revenue decline would be so appreciable that ultimately other customers of the protestant would have to

later bear rate increases to make up for the losses.

It is plain enough that, when a public utility loses customers, its income is reduced and, if that reduction is significant enough, then at some time the deficiency must be made up by rate increases to remaining customers. It is also clear that when a public utility must abandon property and another utility must build additional lines or plant to serve the customer, the usual effect is that one suffers a loss of rate base and the other an increase in rate base, both of which will have some impact on return of the affected companies the next time rates are to be determined.

It cannot be said in this case that Glenwood's fear that gradual erosion of its service territory and customers will affect its ability to service its present debt without substantial increases in rates is unfounded. This is particularly true where, as we have noted, other subscribers may be able to make the same claims as the present applicants. The problem of gradual erosion is a question which the commission must face in ruling on this or some future application.

It is plain from the commission findings that in determining the issue of economic soundness it equated that concept with reimbursement for loss of investment. The commission said: "In view of the testimony that the applicants will compensate Glenwood for its loss of investment, we conclude that the revision of exchange service areas is economically sound . . . ." This finding is an apparent perversion of the meaning of the term as used in condition (2), for condition (4) mandates that in any event applicants be willing and required to reimburse the affected company for loss of investment. The language of the statute cannot possibly be read to mean that if the applicants are willing to reimburse, then the revision of service areas is economically sound.

We hold that in determining economic soundness the commission must consider the financial condition of the protestant telephone company, the effect of the revision on its income and ability to service its debt, the likelihood that the revision will require future rate increases by the affected company, the fact that subscribers other than the applicants may have equally meritorious claims and the general effect of gradual erosion, as well as other matters which may be material and relevant to the issue of economic soundness.

The cause is remanded for further consideration in light of the principles we have announced. The commission should, of course, afford the parties, including LT&T, the opportunity to produce further evidence regarding condition (2) of section 75-613, R. R. S. 1943.

REMANDED WITH DIRECTIONS.