SEDLAK AERIAL SPRAY, LTD., A NEBRASKA LIMITED PARTNERSHIP, APPELLANT, V. KENNETH MILLER, JR., APPELLEE.

555 N.W.2d 32

Filed November 1, 1996.    No. S-94-609.

George H. Moyer, Jr., of Moyer, Moyer, Egley, Fullner & Warnemunde for appellant.

Ray C. Simmons, P.C., for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

The plaintiff-appellant, Sedlak Aerial Spray, Ltd., alleges that the negligence of the defendant-appellee, Kenneth Miller, Jr., proximately caused damage to one of its airplanes. The district court entered judgment for Miller in accordance with the verdict, and Sedlak appealed the dismissal of its action to the Nebraska Court of Appeals, asserting that the district court erred in (1) preliminarily instructing the jury, (2) receiving certain evidence, (3) submitting certain issues to the jury, and (4) responding to a question posed by the jury during its deliberations. Under our authority to regulate the caseloads of the two courts, we, on our own motion, removed the matter to this court. We now affirm.

## II. FACTS

Sedlak is a Nebraska limited partnership in the business of aerially applying agricultural chemicals to growing crops. Sedlak conducted its operations from leased land by engaging various pilots to fly the airplanes from which the chemicals were sprayed. While the pilots did not share in Sedlak's profits, they were in charge of the airplanes they flew and determined when and how to fly. The pilots were paid by the number of acres they sprayed, and Sedlak did not withhold any federal income or Social Security taxes and provided no unemployment

or workers' compensation insurance. Sedlak furnished the chemicals, fuel, and oil, and owned the airplane being flown at the time in question.

The land Sedlak leased consisted of soil pushed together to form a crown 6 to 10 inches higher at the center than the sides, but it otherwise followed the natural contour of the ground. Part of the land was covered with crushed rock and part was seeded with a combination of grasses.

Miller was a tenant in possession of and who farmed the land surrounding Sedlak's land. On August 9, 1990, Miller irrigated his land, and waste irrigation water ran onto the north end of Sedlak's land from Miller's cornfield adjacent to the west side of the Sedlak land.

At approximately 4:30 p.m. on that day, a 1978 Grumman Ag-Cat airplane owned by Sedlak and piloted by Dana Anderson was damaged when, according to Anderson, the airplane touched down at a point approximately 200 feet south of Miller's plowed field at the north end of Sedlak's landing area. Water went over the top of the wings and the tail came up, completely flipping the airplane. As a result, the engine and propeller dug into the ground and tore off, damaging the airplane and leaving it upside down lying on its top. The National Transportation Safety Board determined that the probable cause of the crash was "standing water on the approach end of the runway." This was the seventh landing Anderson had made at the subject landing area that day.

Anderson testified that the airplane he was flying was so constructed that the pilot could not "look straight down below" and that although the pilot looked "straight forward" when spraying, one had to "look out the sides . . . off to an angle" when landing. Not only was he not specifically looking for water or its reflection, he may have been looking into the sun through a bug-spattered windshield. Moreover, the neighboring 60- to 80-foot-tall shelterbelt may have blocked his view, and there were many other variables.

Much of the evidence is in conflict, including where the airplane first touched the ground on landing. There is testimony that this point was anywhere from 50 to 200 feet south of the

plowed cropland field, and testimony that the airplane crashed 100 yards from the north end of the plowed field.

There is also disagreement as to the nature of the north end of Sedlak's land. In registering the flight operation in 1968 with the state and federal government, the original builder, Alvin G. Gruenewald, represented the "airstrip" or "runway" as having a length of 2,600 feet starting from the south property line and running north. However, some evidence suggests that the area had been lengthened over the years and that by 1987, it was approximately 2,930 feet long. Whereas Sedlak contends that the landing area encompassed all of its land from the south fence line to the cropland 2,900 feet north, there was other testimony that the landing area extended from the south fence line to a point only 2,600 feet north, with the remaining 300 to 350 feet at the north end consisting of tall grass and a mudhole.

Gruenewald testified that the mudhole was a natural drainage area for the ground in that the water would flow from the south and from the north, congregate or pool in the hole area, and then eventually travel from west to east via the culvert under the county road. According to him, the water would then run north down the road ditch. However, Bernadette Richards, a Sedlak partner, testified that there was no marshy area on the "runway" and that in the 5 years Sedlak leased the land, she never saw water running across Sedlak's "airstrip" and into the culvert. According to Richards, there were never any occasions when Sedlak could not use an area at the very north end of the land. She did, however, later testify that "[t]here apparently was some low ground there on the north — clear north, north of the north end . . . [o]f the runway," but denied that rainwater ever accumulated there.

A videotape of takeoffs and landings which had occurred prior to the crash shows that during a landing at 6:34 p.m. on June 23, 1990, someone stated, "[D]on't set it down there in the mud." Another voice responded, "I told him."

Joseph Proskovec, a soil conservation contractor, was hired by the landowners after the lease to Sedlak expired to level the land so that the ground could be used for farming. He testified on behalf of Sedlak that a federal geological survey map, his topographic survey, and subsequent land filling all showed "a

low spot or a dip or something like that, a void . . . [a] sinkhole or something like that" beginning 2,300 feet north of the south fence line and ending at the lowest elevation 2,900 feet north of the south fence line.

The evidence as to the height of the grass and the depth of the water in the area is also in conflict. In some testimony, the grass is described as tall and marshy in the area of the mudhole; other testimony puts the height at various levels ranging from 2 to 8 inches. There is also testimony that the grass was longer at the north end of Sedlak's land than at the middle, as the middle grass was abused by propeller wash and tire tracks. Testimony regarding the water estimates its depth at anywhere from 3 to 6 inches.

Whether Sedlak had notice that Miller was to irrigate the field next to Sedlak's land on the day of the accident is also in dispute. Richards and her husband claimed that Sedlak had found irrigation water from Miller's field on its land in 1989 and 1990, that they had on more than one occasion talked with Miller about irrigation water running onto the landing area, and that it could cause an accident. Richards specifically recalled one occasion in 1989 where one of Sedlak's airplanes had taxied down to the north end of its land to take off and had gotten stuck in some water while turning around. Miller, however, claimed that Sedlak never complained about the way he irrigated or told him that it was using the tall grass area for take-offs, landings, or turnarounds. Miller also testified that on the morning of the day of the accident, he had told Richards that he would be irrigating in the vicinity of Sedlak's land and that water would be flowing down to the north. In addition, he instructed her to be careful so that the airplanes did not get too far down. According to Miller, Richards remarked that there would not be a problem because airplanes did not go that far north or use that area.

Charles Yager, a seed company representative, testified that 1 or 2 days after the accident, Richards told him that Miller had notified her about irrigation being started on the morning of the accident. However, Richards claimed that she had spoken to Miller the morning of the accident only with regard to spraying a field. She also testified that she had never seen Yager before

the trial and had never been told by Miller to stay out of the north end.

## III. ANALYSIS

### 1. PRELIMINARY INSTRUCTIONS

In the first assignment of error, Sedlak claims the district court erred in three respects by improperly instructing the jury before any evidence was received, as set forth hereinafter.

At this point, we remind ourselves that jury instructions are subject to harmless error analysis; thus, an erroneous jury instruction requires reversal only if the error adversely affects the substantial rights of the complaining party. See, *Stephens v. Radium Petroleum Co.*, 250 Neb. 560, 550 N.W.2d 39 (1996); *Farmers & Merchants Bank v. Grams*, 250 Neb. 191, 548 N.W.2d 764 (1996); *David v. DeLeon*, 250 Neb. 109, 547 N.W.2d 726 (1996).

### (a) Identity of Lessors

In challenging the preliminary instructions, Sedlak first urges that although the district court initially advised the jury that Miller leased to Sedlak the land it used for its flight operations, following the close of the evidence the district court informed the jury that while Sedlak alleged Miller was a lessor, Miller denied such status.

Although Sedlak sued Miller solely, it alleged that the "defendant*s* leased" land to Sedlak, and Miller's various answers admitted that allegation. (Emphasis supplied.) However, during the course of trial, Miller, without objection, was permitted to amend his operative answer to conform to the proof by denying that he was a lessor. The lease was not offered in evidence, and Sedlak concedes in its brief that Miller was not a lessor.

A litigant is entitled to have the jury instructed only upon those theories of the case which are presented by the pleadings and which are supported by competent evidence. *Farmers & Merchants Bank, supra; Burns v. Metz*, 245 Neb. 428, 513 N.W.2d 505 (1994). Thus, the preliminary instruction in this regard was unquestionably wrong, for it proved not to be supported by the evidence.

However, since Sedlak admits Miller was not a lessor, the district court's preliminary instruction in this regard worked to Miller's prejudice, not to Sedlak's.

### (b) Nature of Danger

Sedlak also complains that in its preliminary instructions, the district court informed the jury that Miller claimed not only that Sedlak had been negligent in failing to keep a proper lookout, but that the danger "was open and obvious." Sedlak urges that the preliminary instruction concerning the obviousness of the danger was improvident, as, in accordance with Sedlak's motion for a directed verdict on that issue, the instructions following the evidence informed the jury only that Miller claimed that Sedlak had been negligent in failing to maintain a proper lookout.

But in the context of this case, the concept of lookout is inextricably intertwined with the obviousness of the condition for which the lookout was to be maintained. Thus, the preliminary instructions in this regard were not in conflict with those given at the close of the evidence. Rather, the preliminary instructions expressed the same concept in more than one way.

While duplication might in some instances in and of itself prejudice a party, it cannot be said to have done so in this case, for there is nothing in the duplication which misled the jury. The controlling rule is that all the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating a reversal. *Hamernick v. Essex Dodge Ltd.*, 247 Neb. 392, 527 N.W.2d 196 (1995); *Scharmann v. Dayton Hudson Corp.*, 247 Neb. 304, 526 N.W.2d 436 (1995); *Sindelar v. Canada Transport, Inc.*, 246 Neb. 559, 520 N.W.2d 203 (1994).

### (c) Status of Pilots

Sedlak further complains that the preliminary instructions were silent as to the issue of whether Anderson was an independent contractor or Sedlak's agent. But the instructions following the evidence did advise the jury that one of its tasks was

to determine Anderson's status, and further informed the jury that Sedlak was responsible for Anderson's negligence if he was Sedlak's agent, but not if Anderson was an independent contractor. As Sedlak does not contend that the matter should have been decided as a matter of law or that the instruction given was erroneous, there is no issue for us to consider in this respect.

### (d) Resolution

Indeed, the foregoing analysis demonstrates the risk inherent in undertaking to preliminarily instruct a jury other than to briefly, and in very general terms, state the nature of the case and describe the manner in which the trial will proceed. One cannot know what allegations will be supported by the evidence until the parties have rested.

Although there were errors in the preliminary instructions, since it cannot be said that they prejudiced any of Sedlak's substantial rights, this assignment of error fails.

### 2. RECEIPT OF EVIDENCE

In the second assignment of error, Sedlak contends the district court erred in permitting Gruenewald to testify.

Gruenewald is an experienced licensed pilot who built the flight area in question and flew from and into it for 20 years. He had also flown the type of airplane involved here once for "[p]robably 30 minutes." He testified that it was "very easy" for the pilot of such an airplane to see water "in [the] grass area, corn fields and so on." He also answered affirmatively to questions which asked whether, if he "were flying over the actual airstrip," he would be able to see water 6 inches deep in grass 6 inches tall and 2 or 3 inches of water in grass 4 or 5 inches tall.

In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by those rules, not judicial discretion, except in those instances under the rules when judicial discretion is a factor involved in the admissibility of evidence. *Reavis v. Slominski*, 250 Neb. 711, 551 N.W.2d 528 (1996); *McArthur v. Papio-Missouri River NRD*, 250 Neb. 96, 547 N.W.2d 716 (1996); *Walpus v. Milwaukee Elec. Tool Corp.*, 248 Neb. 145, 532 N.W.2d 316 (1995).

Sedlak's position is that the testimony was not admissible because it did not relate to the circumstances and conditions which existed when Anderson was landing; specifically, that there was no testimony that Anderson had flown "over the actual airstrip" prior to landing on this occasion. See *In re Estate of Kinsey*, 152 Neb. 95, 40 N.W.2d 526 (1949). But although some of Gruenewald's testimony in this connection was characterized as opinion evidence, in reality he was testifying not to opinions based upon his expertise, but as to his personal knowledge gained from having flown into and from the landing area, from having visited the area on a yearly basis, and from having piloted the type of airplane involved. In this regard, he was testifying not as an expert witness, but as to matters within his personal knowledge. A witness may testify as to matters within the witness' personal knowledge. See, *State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993); Neb. Evid. R. 602, Neb. Rev. Stat. § 27-602 (Reissue 1995). Whether the testimony was to be believed and the weight to be given it were matters for the jury.

Consequently, neither is there any merit to the second assignment of error.

## 3. SUBMISSION TO JURY

In the third assignment of error, Sedlak asserts the district court erred in not granting it a directed verdict on the issues of whether its pilot maintained a proper lookout and proper control of the airplane.

In ruling on a motion for directed verdict, the trial court resolves the controversy as a matter of law and may grant the motion only when the facts are such that reasonable minds can draw but one conclusion from the evidence. The party against whom the motion was granted is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can reasonably be drawn from the evidence; if there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. *McWhirt v. Heavey*, 250 Neb. 536, 550 N.W.2d 327 (1996); *Nickell v. Russell*, 247 Neb. 112, 525

N.W.2d 203 (1995); *Coppi v. West Am. Ins. Co.*, 247 Neb. 1, 524 N.W.2d 804 (1994).

The evidence concerning the issues of lookout and control detailed in parts II and III(2) above was such that reasonable minds could find that Sedlak's pilot should have seen and avoided the water.

Therefore, the third assignment of error is also without merit.

### 4. RESPONSE TO JURY QUESTION

In the fourth and last assignment of error, Sedlak claims the district court responded improperly to an inquiry the jury made after retiring for deliberations.

The jury asked: "According to the law does an airfield need to be certified to be a legal airfield?" The district court responded, in relevant part: "All of the law applicable to this case was included in the original jury instructions given to you . . . ."

Sedlak urges that, instead, the district court should have answered the question either with a simple no, or by advising the jury that "[a]n airfield is an area of land used, or intended to be used, for landing and take-off of aircraft. Registration of an airfield is for informational purposes only. Registration of an airfield is optional in Nebraska."

Sedlak also contends that as the question sought information on the law, the district court was obligated to answer the question. In doing so, it points to Neb. Rev. Stat. § 25-1116 (Reissue 1995), which reads:

> After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony, or if they desire to be informed as to any part of the law arising in the case, they may request the officer to conduct them to the court where the *information upon the point of law shall be given*, and the court may give its recollection as to the testimony on the point in dispute in the presence of or after notice to the parties or their counsel.

(Emphasis supplied.)

But it is well established that there is no universal test by which directory provisions of a statute may be distinguished from mandatory provisions. *State ex rel. Grape v. Zach*, 247 Neb. 29, 524 N.W.2d 788 (1994); *Anderson v. Board of*

*Educational Lands & Funds*, 198 Neb. 793, 256 N.W.2d 318 (1977). Consequently, while the word "shall" may render a particular statutory provision mandatory in character, when the spirit and purpose of the legislation require that the word "shall" be construed as permissive rather than mandatory, such will be done. *In re Interest of Brandy M. et al.*, 250 Neb. 510, 550 N.W.2d 17 (1996); *State ex rel. Grape, supra*; *Hartman v. Glenwood Tel. Membership Corp.*, 197 Neb. 359, 249 N.W.2d 468 (1977). Given the separation of powers concerns in statutes which undertake to prescribe how the judicial department shall conduct judicial business, we have in a number of instances ruled, stating a variety of reasons, that the use of the word "shall" in such statutes was permissive rather than mandatory. E.g., *State ex rel. Grape, supra* (ex parte investigations); *In re Interest of C.P.*, 235 Neb. 276, 455 N.W.2d 138 (1990) (hearing to be held within specified time); *State, ex rel. Sorensen, v. State Bank of Minatare*, 123 Neb. 109, 242 N.W. 278 (1932) (appointment of receiver); *Nebraska Loan & Building Ass'n v. Perkins*, 61 Neb. 254, 85 N.W. 67 (1901) (construction of contracts).

While we have not heretofore considered the precise issue presented by Sedlak, we have long held that whether to recall a jury after it has retired for deliberations is a matter entrusted to the discretion of the trial court. See, *Shiers v. Cowgill*, 157 Neb. 265, 59 N.W.2d 407 (1953); *Hardesty v. State*, 95 Neb. 839, 146 N.W. 1007 (1914); *McClary v. Stull*, 44 Neb. 175, 62 N.W. 501 (1895). We now hold that whether to answer a question of law posed by a jury which has retired for deliberations is likewise a matter entrusted to the discretion of the trial court and that in the absence of an abuse of that discretion, its action will not be disturbed on appeal.

With that determination having been made, we assume, without deciding, that Sedlak's representation to the district court of the law on the issue in question is correct, and examine whether the district court abused its discretion in refusing to instruct in accordance with Sedlak's desires.

Sedlak points out that when the jury's question in this regard is considered in the context of an earlier unanswered question it posed, whether the lease covering the Sedlak land specified the length of the "airstrip," it becomes obvious that the jury was

focusing on whether Sedlak was limited to landing on a "2,600 foot runway" registered by Gruenewald or whether Sedlak "could conduct flight operations on the runway as it existed . . . in 1990."

But that is not at all clear; even if we treat the word "runway" to be synonymous with "airstrip," the jury did not refer to the same items in the two questions. In the first, the jury was concerned with the airstrip, and in the second, with the airfield. Airfield would seem to be a broader term than airstrip, so what was in the jury's mind is unknown. Even more importantly, without further explanation, what the jury meant by the word "airfield" cannot be known. On that ground alone, the district court did not abuse its discretion in refusing to answer other than as it did.

Moreover, although Gruenewald testified as to the length of the airstrip or runway when he registered the operation, neither party made registration an issue in the lawsuit, and registration was not relevant to the negligence of either party. The simple question was whether, under the conditions then and there existing, Anderson should have seen the water on the ground and avoided it.

As a result, this assignment of error is as meritless as the previous three.

### IV. JUDGMENT
Being correct, the judgment of the district court is affirmed.

AFFIRMED.